652 So.2d 605 (1995)
Priscilla TILLMAN, Individually and as Duly Qualified Natural Tutrix of Her Minor Child, Cedric Tillman
v.
David JOHNSON.
No. CA 94 0480.
Court of Appeal of Louisiana, First Circuit.
March 3, 1995.
*607 Richard H. Barker, IV, New Orleans, for appellant-plaintiff Priscilla Tillman.
Christopher H. Riviere, Thibodaux, for appellees-defendants Moise David Johnson, Sr., Kathleen Johnson, Robert Durocher, Nolan Durocher and Millers Mut. Fire Ins. Co.
Kerry P. Camarata, Thibodaux, for intervenor Richard A. Thalheim, Jr.
Donna Adorno, Baton Rouge, for intervenor State of LA, Dept. of Health and Hospitals.
Vincent Dagate, Jr., Houma, for defendant-in-intervention Authement & Larke.
Douglas Authement, Houma, pro se.
George J. Larke, Jr., Houma, pro se.
Before FOIL, WHIPPLE and KUHN, JJ.
FOIL, Judge.
This is a suit for damages for personal injury from lead paint poisoning sustained by a child while living in two rental properties owned by defendants. Plaintiff challenges the trial court's judgment rendered in conformity with a jury's finding that the lead paint in the properties in question did not pose an unreasonable risk of harm to the child. We reverse.

FACTS
Priscilla Tillman gave birth to a son, Cedric, on May 29, 1985. In December, Priscilla and Cedric moved into a residence located at 103 Lawrence Street in Thibodaux, Louisiana. They lived there as guests of a friend who was renting the house from the owners, Kathleen and David Johnson. Several months later, Mrs. Tillman noticed a change in Cedric's general health and behavior. The child was examined by the Lafourche Parish Health Unit of the Louisiana Department of Health and Human Resources (DHHR). Diagnostic testing revealed that Cedric was suffering from lead poisoning. A sanitarian with DHHR conducted an environmental lead survey on the Lawrence Street residence. His inspection revealed that old paint peeling from the house contained lead levels exceeding allowable limits. The Johnsons had no knowledge of the presence of lead paint on the residence prior to being notified of the survey results by DHHR. In the fall of 1986, the Tillmans vacated the Lawrence Street residence and the Johnsons then corrected the problem.
In December, 1986, Priscilla and Cedric moved into a house her mother was renting at 919 Harrison Street. That house was owned by Nolan and Robert Durocher. Because test results continued to show high blood lead levels, a sanitarian was sent to do a lead survey at the new address. The survey was conducted on May 8, 1987, and it revealed high levels of lead which exceeded the standard. Again, the Tillmans were required to move from the residence in order to allow the Durochers to clean up the premises.

PROCEDURAL HISTORY
Plaintiff, Priscilla Tillman, individually and as natural tutrix of her minor child, Cedric, filed this suit seeking damages for lead poisoning suffered by the child. She also sought recovery for medical expenses and loss of consortium. Plaintiff's suit was initially brought against the Johnsons and their homeowners insurer, Millers Mutual Fire Insurance Company of Texas. However, she later amended her petition to name as defendants the owners of the second rental premises, the Durochers. Defendants subsequently filed a motion for summary judgment on the issue of liability. After a hearing, the trial court granted the motion, thereby dismissing plaintiff's suit. The court found that there was no issue of material fact, nor was there liability, as a matter of law, under the applicable theories of recoverynamely, La. R.S. 40:1299.26 et seq. (the Lead Paint Poisoning Prevention and Control Act), and Louisiana Civil Code articles 660, 2322, 2695, 2315 and 2316.
*608 Plaintiff appealed the trial court's granting of defendants' motion for summary judgment. Adopting the trial court's written reasons as our own, another panel of this court affirmed its judgment. Tillman v. Johnson, 610 So.2d 866 (La.App. 1st Cir.1992). The Louisiana Supreme Court granted writs in the matter and, in a per curiam opinion, reversed the decision of this court and remanded the case for a trial on the merits. Tillman v. Johnson, 612 So.2d 70 (La.1993). The court stated:
... [T]he filings in this case indicate that there is a genuine dispute as to whether the lead-based paint on the defendants' respective properties presented an unreasonable risk of harm to the petitioner's minor child for purposes of strict liability under La.Civ.Code art. 2317. This is a disputed issue of mixed fact and law or policy that is peculiarly a question for the jury or trier of the facts.
On remand, the matter was presented to a jury in a three-day trial. In response to the first question on the special verdict form, "Did the presence of lead paint on the properties in question present an unreasonable risk of harm to Cedric Tillman?", the jury answered, "no." Accordingly, the trial court rendered judgment in conformity with the jury verdict, dismissing plaintiff's suit. She then filed the instant devolutive appeal. Plaintiff urges six assignments of error; however, because we agree with her first assertion that the jury verdict was clearly erroneous and unsupported by the law and evidence, we pretermit discussion of the remaining assigned errors.

STRICT LIABILITY
The Supreme Court remanded this case for a determination of whether defendants are strictly liable under La.Civ.Code art. 2317, which provides, in pertinent part, that "[w]e are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody." To recover under this theory, plaintiff must prove: 1) the thing which caused the damage was in the custody of defendant; 2) the thing contained a defect which created an unreasonable risk of harm; and 3) the injuries were caused by the defect. Sistler v. Liberty Mutual Insurance Company, 558 So.2d 1106 (La.1990).
In the instant case, the first element, custody of the two rental properties, is clearly met. It is undisputed that the Johnsons owned the property at 103 Lawrence Street, and the Durochers owned the property at 919 Harrison Street. Thus, the critical issue involves the second element, whether the premises contained a defect which presented an unreasonable risk of harm under the circumstances of this case.
The unreasonable risk of harm criterion involves numerous considerations and cannot be applied mechanically. Oster v. Department of Transportation and Development, 582 So.2d 1285, 1288 (La.1991). In addition to balancing the likelihood and magnitude of harm against the utility of the thing, the trier of fact should consider a broad range of social, economic, and moral factors including the cost to defendant of avoiding the risk and the social utility of plaintiff's conduct at the time of the accident. Id. at 1289. The obligation placed by article 2317 upon a homeowner to maintain his property free from defects does not encompass every injury that happens to occur on his property. Because the owner cannot be held responsible for all injuries resulting from a risk, the court's duty is to decide which risks are unreasonable. A court utilizing an article 2317 strict liability analysis must determine whether the codal duty imposed upon the custodian of the thing was placed upon him to prevent the type of accident involved in the case before the court. The court must carefully consider all the circumstances surrounding the particular misfortune under review to determine whether allowing recovery to the particular plaintiff involved, for damages occurring in the particular manner in which the plaintiff was injured, is desirable from the standpoint of justice and the social utility of the conduct of the respective parties. Id.
Here, the jury found that the presence of lead paint on the rental properties *609 did not constitute a defecti.e. the condition did not present an unreasonable risk of harm to Cedric Tillman. On review, a court of appeal may not set aside a jury's finding of fact in the absence of manifest error or unless it is clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989).
It is common knowledge that lead paint presents a potential health hazard to small children. We must ask ourselves if the condition of the paint in this case presented an unreasonable health risk to the particular child involved. We find that the likelihood of the risk of lead poisoning in the two residences was apparent. It was uncontradicted that the paint in both of the premises in question contained excessive levels of lead. The evidence showed that, in both houses, the paint was peeling and flaking off, resulting in the presence of paint chips and paint dust. Dr. Susan Andrews, a neuropsychologist, testified that, not only can lead-based paint be eaten, paint dust can be absorbed through the skin. During the relevant time period when Cedric Tillman lived in the Lawrence Street and Harrison Street residences, he was approximately seven months to two years old. A child of that age would have been crawling about on the floor, then toddling and eventually walking around the house. In light of these particular facts, we find there was a great likelihood that Cedric Tillman might suffer lead poisoning. Further, the magnitude of the risk (i.e., the severity of the consequences if lead poisoning occurs) is also substantial. Dr. Susan Andrews, a neuropsychologist, testified that chronic exposure to lead can cause many problems, the most common of which is ADD (Attention Deficit Disorder). Language learning disability is also very common in children with lead poisoning. Certainly, there is no longer any utility in using leadbased paint, particularly in a residential environment. We note that no evidence was presented at trial to suggest that removal of the lead-based paint would present any unusual difficulty or cost. To the contrary, it was undisputed that both the Johnsons and the Durochers removed the offending paint immediately after being informed of its presence by DHHR.
After carefully considering all of the circumstances surrounding the lead poisoning suffered by Cedric Tillman, we conclude that it was clearly wrong for the jury to find that the condition existing in the properties in question did not pose an unreasonable risk of harm to that young child.
When the court of appeal finds that a manifest error of fact occurred in the trial court, it is required to redetermine the facts de novo from the entire record and render a judgment on the merits. Rosell v. ESCO, 549 So.2d at 844, n. 2. Since we have found that the first two elements of strict liability were met in this case, we must now address the third element which requires the plaintiff to prove that the injuries sustained were caused by the defect.

CAUSATION
The third element in a strict liability action is the causal relationship between the defect and the damages. Thus, to recover, the injured person must prove that his damage occurred because of the risk involved.
At trial, plaintiff attempted to prove that Cedric Tillman suffered permanent organic brain damage resulting from the lead poisoning. Dr. Susan Andrews, a neuropsychologist, examined and evaluated Cedric at age four. Testing revealed that Cedric had a full scale I.Q. of 68, which is in the borderline to mild mentally retarded range. His motor functions were less than those of a two-year-old. Dr. Andrews testified that these problems typically indicate organ dysfunction in the brain itself. She felt that Cedric's problems, such as ADD, were consistent with problems caused by chronic exposure to lead. Dr. Andrews retested Cedric four years later and obtained the same I.Q. results. She opined that it is more likely than not that Cedric's problems were caused by lead poisoning. However, on cross examination, Dr. Andrews admitted that there are other causes of hyperactivity and behavior problems. Cedric, his mother, Priscilla, and his younger brother, Duane, had approximately the same range of I.Q., but Dr. Andrews thought that Cedric's problems were different and distinguishable from the I.Q. baseline *610 deficit found in Duane and Priscilla. Finally, Dr. Andrews testified that Cedric's flat scores across the board on the tests he took were consistent with non lead-related mental problems.
Dr. Daniel J. Trahant, a neurologist, testified by deposition that he examined Cedric Tillman on February 18, 1988. Dr. Trahant stated that the clinical examination was entirely normal. He did not see anything to indicate any neurological sequelae from lead poisoning. From a neurological standpoint, Cedric's development was normal for his age and station in life. Dr. Trahant pointed out that, just because someone has a high lead level does not mean that there is neurological damage from it.
Dr. William Black, an expert neuropsychologist, evaluated Cedric, Duane and Priscilla Tillman in July, 1993, at the request of defendants. Cedric performed overall within the mildly impaired range. He was consistent in test performance, comparing one test with another. Dr. Black testified he found it apparent that Cedric has brain-related deficits in neuropsychological functioning, but he was uncertain as to the etiology of those problems. He tested Cedric's mother and found a general intellectual level within the borderline range. She basically performed within a very similar range as Cedric. Dr. Black also tested Duane Tillman, whose I.Q. score of 62 came very close to Cedric's score of 68. He found a great deal of consistency in terms of intellectual functioning between the two brothers. Dr. Black stated that the family baseline data is absolutely essential when dealing with a problem like lead ingestion. Cedric's test performance in each area was consistent with the level of all members of his family. In some areas, Cedric performed better than his family members. Dr. Black concluded that one must consider factors other than lead exposure to explain the difficulties Cedric has, e.g. genetics or the social experiences of the family.
Dr. Jean N. Takenaka practices medicine in public health and pediatrics. She worked at the public health unit and treated Cedric Tillman's lead poisoning for several years. She testified that a child generally picks up lead in his system through the environment in which he lives. However, when asked about the cause of Cedric's developmental problems, Dr. Takenaka noted that is a question under much discussion, i.e. how much of such problems is directly attributable to lead versus inherent genetics or the environment of the individual child.
In light of the expert testimony on this issue, we conclude that plaintiff failed to support her burden of proving that Cedric suffered from permanent brain damage caused by lead poisoning. Rather, the evidence showed that Cedric's behavioral problems and learning disabilities are just as likely to be the result of his genetic makeup or the environment in which he lives. However, we do find it clear that Cedric Tillman became physically ill from the lead poisoning. He required medical treatment which included countless trips to the health unit where he was seen by Dr. Takenaka. Her testimony reveals that Cedric first tested positive for blood lead on August 20, 1986. The test was repeated at least three more times in 1986 by means of a venipuncture sample taken through the vein. Cedric saw Dr. Takenaka at least eight times (almost monthly) in 1987, and was tested for blood lead levels each time. In all but two of those tests, Cedric's lead level was given a risk class 3 (indicating the highest in elevation of blood lead). In 1988, Cedric was tested three times and each time his blood lead level was given a risk class 1-A (indicating an iron deficiency but no elevated lead). In 1989, Cedric was tested three times again, receiving two risk class assignments of 1-A and one class 2. Throughout his treatment Cedric was required to take medication as much as three times a day. We believe that the sum of $20,000.00 will adequately compensate him for the injuries sustained. We decline to make an award for Mrs. Tillman's loss of consortium claim.
The record shows that Cedric Tillman was treated at the Lafourche Parish Health Unit and received medication through the WIC Program. Thus, there is no evidence of medical expenses incurred in connection with the child's lead poisoning. While there is proof in the record of other medical expenses, we *611 find that they were unrelated to the injuries which form the basis of this lawsuit.
For the above reasons, the judgment of the trial court is reversed. We hereby render judgment in favor of plaintiff and against defendants, awarding general damages in the amount of $20,000.00[1], plus legal interest from the date of judicial demand and all costs of the trial and this appeal.
REVERSED AND RENDERED.
NOTES
[1] We recognize that, pursuant to the stipulation entered into by plaintiff, defendants and intervenor, the State of Louisiana through the Department of Health and Hospitals on behalf of South Louisiana Medical Center, intervenor is entitled to recover $2,032.36 out of the judgment rendered against defendants.